UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
BISNOW LLC,                                                    Case No. 20-cv-3441

                 *Plaintiff*,

         – against –

THOMAS LOPEZ-PIERRE,

                 *Defendant*.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Plaintiff Bisnow LLC ("Plaintiff" or "Bisnow"), by its attorneys, Judd Burstein, P.C.,

respectfully submits the following Proposed Findings of Fact and Conclusions of Law:

### A.    PROPOSED FINDINGS OF FACT[1]

    I.    **The Parties**

       (a)    *Plaintiff Bisnow*

    1.    Plaintiff Bisnow is a limited liability company organized under the laws of the

District of Columbia.  Some of its limited partners are citizens of the State of New York.  (Compl.

¶ 6).

---

[1]    The proposed findings of fact submitted herewith are drawn in part from Plaintiff's Complaint ("Compl.") filed in this action.  (*See* Doc. No. 1 and Exhibit A to the accompanying October 29, 2020 Declaration of Peter B. Schalk "Schalk Dec.")).  This is appropriate under established precedent in light of Hon. Paul A. Engelmayer's ruling at Doc. No. 23, that a default judgment be entered in this case for Plaintiff against Defendant Thomas Lopez-Pierre. *See Alfonso v. New Day Top Trading, Inc*., No. 18cv4745 (PAE) (DF), 2020 U.S. Dist. LEXIS 116047, at *16 (S.D.N.Y. June 29, 2020) ("There is no question that 'default is an admission of all well-pleaded allegations against the defaulting party[.]'") (Quoting *Vermont Teddy Bear Co., Inc. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004)); "Thus, as a general matter, a district court must accept as true all of the factual allegations of the non-defaulting party and draw all reasonable inferences in its favor."  (*Id.*) (Citing *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)).

2.    Bisnow is the largest commercial real estate news and events media platform in the world.  Every year, Bisnow puts on more than 300 professional events in dozens of cities across North America and Europe.  These events feature a diverse array of business leaders and experts from all facets of the commercial real estate industry.  As a media outlet, Bisnow provides high-quality, daily content about the commercial real estate industry to both professionals and the public.  Through the brand "SelectLeaders," Bisnow also operates the largest real estate jobs platform in the world.  (Compl. ¶ 7).

        (b)    *Defendant Thomas Lopez-Pierre*

3.    Defendant Thomas Lopez-Pierre ("Defendant" or "Lopez-Pierre") is a citizen of the State of New York.  He presents himself publicly as both a successful real estate broker/entrepreneur and a concerned activist seeking to combat racism and sexism, as well increase both opportunity and diversity in the real estate industry.  In truth, his activities are designed to benefit only himself personally.  (Compl. ¶ 8).

4.    As confirmed by publicly available information about Lopez-Pierre:

        a.    He has posted videos online in which he asserts that he is the managing member of the Harlem Real Estate Fund, LLC ("Harlem Fund"), a purported private equity fund which he claims has funded at least two real estate renovation projects in New York City.  Yet, New York City's ACRIS real property database does not identify even one property in which the purported fund has an interest either as an owner or a lender.  These real estate projects are fabrications.  Moreover, on his "LinkedIn" page, Lopez-Pierre states that the Harlem Fund is a "New York State Licensed Real Estate Broker."

According to the New York Secretary of State's website, the Harlem Fund does not hold any type of real estate license;

b.     Defendant's website further holds himself out as "a self-employed, NYS Licensed Real Estate Broker with Lopez-Pierre Realty LLC." But according to the New York Secretary of State's website, neither Lopez-Pierre nor Lopez-Pierre Realty LLC has any type of real estate license;

c.     His website fraudulently solicits funds for "The Real Estate Diversity PAC: A Political Action Committee Advocating for Racial and Gender Diversity within the Commercial Real Estate Industry in New York, New Jersey and Connecticut" ("Real Estate Diversity PAC"), by falsely characterizing it as a 501(c)(4) organization. However, as per the Internal Revenue Service's database of tax-exempt organizations, the Real Estate Diversity PAC does not have 501(c)(4) status. Indeed, according to a nationwide database search of public records, the Real Estate Diversity PAC does not exist. Further, it does not appear to have any public presence other than on Lopez-Pierre's "LinkedIn" page, his website -- which he fraudulently uses to secure contributions -- and in the emails he sends in an effort to extort Bisnow and other victims;

d.     He has also fraudulently solicited funds for the Harlem Family Eviction Prevention Fund, Inc. ("Harlem Family Eviction"), representing it to be a 501(c)(3) charitable organization. A search of the Internal Revenue Service's

3

database of tax-exempt organizations reveals that it does not have 501(c)(3) status;

e.   He fraudulently raised money for his failed 2017 City Council campaign ("2017 Campaign") by soliciting campaign contributions from non-supporters through a GoFundMe web page entitled "Stop Thomas Lopez-Pierre Hate Campaign."  Lopez-Pierre confirmed to *The New York Post* that he had intentionally engaged in a "bait and switch" in order to obtain money from people who "oppose me.";

f.   Lopez-Pierre stole taxpayer monies in the form of matching funds from the New York Campaign Finance Board by, *inter alia*, (i) minimizing the dollar amount of campaign contributions he received so as to obtain matching funds to which the 2017 Campaign was not entitled, and (ii) using campaign funds for personal expenses; and

g.   Notwithstanding his false claims that he advocates for racial equality and non-discrimination through the Real Estate Diversity PAC, Lopez-Pierre has shown himself to be a virulent bigot by, at a minimum, the following:

(i)   During his failed 2017 Campaign, he accused "greedy Jewish landlords" in New York City of engaging in an "ethnic cleansing" and "Housing Holocaust" by pursuing a "'Final Solution' to push out Black and Hispanic tenants.";

(ii)   In 2012, during another one of his failed campaigns for the City Council, he castigated "dumb black politicians for letting Dominican people gain control of Harlem."; and

(iii)   In 1999, he criticized Manhattan businesses for hiring "Arab" and Indian employees instead of black and Hispanic people.

(Compl. ¶ 8).

5.   In addition to the hypocrisy demonstrated by his racial bigotry, Defendant has falsely accused Bisnow of sexism even though he is blatantly sexist and abusive towards women, as demonstrated by the following facts:

a.   In one of his many short-lived business ventures, Lopez-Pierre operated a members-only singles club called the "Harlem Club." According to *The New York Times*, he "deleted the e-mail applications of overweight women," and refused to consider applications from women who were not "35 or younger, ... childless ... and willing to submit a head-to-toe photograph, to prevent unattractive women from making the cut." When asked to explain the age-limit of 35, he responded: "A lot of these women are in their early 40's, and their good-looking days are over.";

b.   In 2016, he pled guilty to second-degree attempted criminal contempt. According to media reports, he was charged with criminal contempt for violating an order of protection his ex-wife (and mother of his three children) had obtained against him. In the face of the order of protection, Lopez-Pierre allegedly approached her and said "Don't fu*k with me, bitch!";

5

      c.      In August 2013, a New York assemblywoman accused Lopez-Pierre of groping her buttocks, alleging that he said, "Oh, this is turning me on!"  In denying the allegation, Lopez-Pierre called the assemblywoman a "$20 political slut" and claimed that she had rubbed "her nasty fat ass" against his body; and

      d.      According to New York State records, he is a "deadbeat dad" who has failed to pay child support.  During a February 2020 meeting with Bisnow executives, Lopez-Pierre confirmed that he hides his assets to avoid meeting his child support obligations: "I have an ex-wife, so I don't need to pay more in child support, so nothing will ever be in my name.  Like I said, I make sure I stay judgment-proof.  I am poor.  If you don't believe me, ask my ex-wife...."

(Compl. ¶ 8).

6.      Since late 2019, Lopez-Pierre has been seeking to extort Bisnow into meeting his financial and other demands by, in his own words, "go[ing] after its economics" and "kill[ing] the brand."  His tactics have included:

      a.      Threatening paying-sponsors of events produced by Bisnow that, unless they withdrew their sponsorships of those events, "[o]ur protestors will visit the corporate offices, homes and houses of worship of the speakers and sponsors of real estate event producers and yell that 'XYZ' person and/or firm is RACIST and SEXIST, until NYPD Officers arrive and drag them out kicking

and screaming (which will be recorded on cellphones for social media).";

and

b.      Also threatening those sponsors that

we plan to buy tickets for recently incarcerated Black and Hispanic men to attend [their Bisnow] events, in order to disrupt and hold up banners ("XYZ White Real Estate Professional Or Firm Is RACIST Against Black and Hispanic Real Estate Professionals")....

Trust me you will just love the video of police officers dragging a group of kicking and screaming recently incarcerated Black and Hispanic men out of [their] events for protesting the lack of Black, Hispanic, Asian, and Women speakers.

(Compl. ¶ 1) (emphasis omitted).[2]

7.      Lopez-Pierre's effort to extort Bisnow is not an isolated criminal endeavor.  Rather, through the use of a web of actual and fictitious entities, Defendant has been engaged in an ongoing, multi-year pattern of racketeering; one which includes (a) similar efforts to extort other companies and individuals engaged in the real estate industry; (b) securing campaign contributions by fraud; (c) defrauding the New York City Campaign Finance Board; (d) fraudulently evading his court-ordered child support obligations; (e) seeking investments in a private equity fund by falsely claiming that it is operational; and (f) seeking contributions for a non-existent political action committee.  (Compl. ¶ 2).

8.      Lopez-Pierre's accusations against Bisnow are false.  Bisnow has never engaged in any racist, sexist, or discriminatory conduct, and well before Lopez-Pierre commenced his extortion

---

[2]      The many grammatical and spelling errors that appear throughout Defendant's writings are his own which are presented here verbatim.  The use of the term "*sic*" should be deemed to apply to every such error in the communications from Defendant to Plaintiff (and others) quoted in this submission.

scheme, it had already been taking actions in furtherance of its commitment to increasing diversity in its business.  (Compl. ¶ 3).

## II.     Racketeering in Violation of 18 U.S.C. § 1962(c)

###     i.     *The RICO Enterprise*

9.     Lopez-Pierre operates and controls the "TLP Enterprise," an association-in-fact RICO Enterprise as that term is defined by 18 U.S.C. § 1961(4).  The members of the TLP Enterprise include:

  a.     Lopez-Pierre;

  b.     The Harlem Fund, a limited liability company organized under the laws of the State of New York;

  c.     Lopez-Pierre Realty LLC ("Realty LLC"), a limited liability company organized under the laws of the State of New York;

  d.     Harlem Family Eviction, which has been organized under the laws of the State of New York as a not-for-profit corporation; and

  e.     The Committee to Elect Thomas Lopez-Pierre ("2017 Election Committee"), an entity through which Lopez-Pierre raised funds for the 2017 Campaign. The 2017 Election Committee was registered with the New York City and New York State Boards of Elections, assigned an EIN by the Internal Revenue Service, and maintained a bank account.

(Compl. ¶ 10).

10.     The members of the TLP Enterprise have associated with each other, and have functioned for at least the past three years as a continuing unit with the common purpose of enriching

8

Lopez-Pierre.  (Compl. ¶ 11).  Further, during a meeting with Bisnow executives on February 20, 2020, Lopez-Pierre stated:

> If you looked at my website you notice that I have the private equity fund, I have Lopez-Pierre news, which is, I want to copy a little bit like Bisnow.  I have the events part, um, I have the political action committee, and then I have the private club.  And so next year, we're going to be opening a private club that's like a Harvard/Yale club.  My name will be on none of the documents; I'll own nothing, um, and, which is very specific, I have an ex-wife, so I don't need to pay more in child support, so nothing will ever be in my name.  Like I said, I make sure I stay judgment-proof.  I am poor.  If you don't believe me, ask my ex-wife, she'll be happy to tell you.  Um, and, so, everything is interchangeable....

(Compl. ¶ 11).

ii.    _Lopez-Pierre's Management and Control of the TLP Enterprise_

11.    At all times relevant to this dispute, Lopez-Pierre has managed and controlled the TLP Enterprise by reason of the following:

a.    He has publicly stated that he is (i) the managing member of the Harlem Fund and Realty LLC, and (ii) the Chairperson of Harlem Family Eviction;

b.    He controlled the 2017 Election Committee's bank account and financial operations.  For example, according to the testimony of the Committee's treasurer before the New York City Campaign Finance Board ("NYCFB"), Lopez-Pierre personally withdrew cash from the Committee's bank account without her involvement; and

c.    Lopez-Pierre's apartment residence, located at 927 Columbus Avenue, Apt. 5S, New York, New York 10025, also serves as the offices for the Harlem Fund, Realty LLC, Harlem Family Eviction, and the 2017 Election Committee.

(Compl. ¶ 12).

        iii.      *Lopez-Pierre has Engaged in Racketeering Activity*

12.      Lopez-Pierre has engaged in "racketeering activity," as that term is defined by 18 U.S.C. § 1961(1), by committing the following crimes:

    a.      As briefly summarized above, and discussed in detail below, Interference with Commerce by Threats or Violence against Bisnow, its event sponsors, and its event speakers in violation of 18 U.S.C. § 1951;

    b.      Also in violation of § 1951, similar extortions directed at Bisnow's competitors;

    c.      In violation of New York Penal Law § 180.03, bribery of an employee of an unnamed New York real estate firm in return for disclosing confidential information about its executives;

    d.      In violation of 18 U.S.C. § 1343, engaging in a wire fraud scheme pursuant to which he obtained contributions from people who did not support Lopez-Pierre's candidacy for New York City Counsel through a GoFundMe campaign which fraudulently represented that the contributions would be used to defeat Lopez-Pierre's candidacy; and

    e.      In violation of 18 U.S.C. § 1343, engaging in a wire fraud scheme by soliciting and receiving contributions for the Real Estate Diversity PAC based upon false representations that it (i) exists, and (ii) is a 501(c)(4) entity.

(Compl. ¶ 13).

iv.     *The Attempted Extortion of Bisnow*

A.     Overview of Lopez-Pierre's Scheme

13.     Lopez-Pierre has sought to extort Bisnow through a sophisticated effort in which he pretends that, as an advocate for social justice, he is merely (a) exercising his First Amendment right both to protest against Bisnow's and its event sponsors' racism, and (b) advocate for more diversity in Bisnow's conduct of its business.  These contentions are false.  (Compl. ¶ 14).

14.     In addition to other services it provides, Bisnow produces events at which significant leaders in the real estate industry participate in public panel forum with the intention of  informing and connecting the commercial real estate industry to do more business.  This part of Bisnow's business earns money in two ways: (a) it sells tickets to these events, and (b) it is paid fees by real estate companies in return for the right to serve as a sponsor of the event.  A sponsorship is a valuable asset for Bisnow to sell because it generally provides the sponsor with the right to have one or more of its executives serve on the panel.  Often, there is more than one sponsor of the event and therefore more than one speaking slot which Bisnow must reserve.  Participation on a panel is a valuable commodity for the sponsor because it increases visibility in the industry and serves as a significant business development tool.  Hence, Bisnow's ability to earn a profit by selling sponsorships is directly tied to its ability to provide those sponsors with the opportunity for one or more of its executives to participate as an event speaker.  (Compl. ¶ 15).

15.     Lopez-Pierre has been threatening Bisnow with violence and economic harm in an effort to force Bisnow into guaranteeing that 50% of the speakers on its panels will be people of color or women, regardless of whether any of these proposed speakers are affiliated with a paying sponsor.  (Compl. ¶ 16).

11

16.     In a meeting with Bisnow executives in February of 2020, Lopez-Pierre told them part

of what would happen if they did not bend to his threats:

> So that means that when, you know, so and so at so and so law firm speaks at an
> event, a month later we'll show up at their offices, you know, we'll get into their
> building somehow.  We're good at it, even if we have to make an appointment for
> something, we'll get into the building somehow.  And then for 2 minutes in the
> lobby, just "Mr. Jones is racist against black people because he speaks at _____
> events."  All we need is 2 minutes and 20 seconds because that's what Twitter allows
> you to put on.  And then they'll go.  It's all about killing the brand.

(Compl. ¶ 17).

17.     He then admitted at the meeting that he was not seeking money directly from Bisnow

because he was being paid by "black professionals" to threaten Bisnow into allowing them to

participate as speakers at Bisnow events so that they could make money from the business

opportunities which flow from those engagements:

> **But still, the black professionals are angry.  And none of them-- a number of
> them are tired of looking the other way, so they say "we'll bankroll the
> initiative, but we want our name off it.  And we don't even want you telling us
> to know our names, we'll just-- you tell us where would you like the money,
> where would you like the money."**  I don't even know their names.  I have one
> contact, but they've already proven that they're willing to put money down.  Because
> I said "**Before I move forward, I need to see this amount of money." Within 24
> hours, that money was delivered. So now I'm on board 'cause I know they're
> serious.**  And the agenda is, then I go to-- 'cause I ran for city council so I have grass-
> roots relationships in public housing and I went to them and said "listen, how much
> you need to get paid to go to a real estate-related event and hang up a banner?  I just
> need you to do it for 3 minutes 'cause I need to get it on YouTube, and just say
> '_____ is racist, _____ is racist against black people' 'cause they want, you
> probably won't get arrested, but if you do, let them drag you kicking and screaming.
> New York no longer has bail, so you'll be out within-- and you'll get paid 3-400
> dollars, cash.  They go "my ni**a yo, I'll do that shit in a minute.  Tell me my boy,
> when can we do that?"

* * *

And, here's the important part.  Well, there's 2 things that are-- this part is really important.  Well one is, I never touch the money.  So the real estate diversity PAC, it'll have very little money in there 'cause none of the money comes from there.  Because somebody could-- some judge could seize that money.  It'll always be cash, it'll always be other parties.  I will never touch the money.  The second thing is, you will never, ever, be asked for money.  Not to donate to a not-for-profit, not to give us money to go away.  It's not gonna be a Nike kind of situation, never.  We don't want your money.  Freedom has to be paid for.  That's the message.  **You black folks in commercial real estate, you want the benefit of this?  You have to pay for it.  And they're willing to pay for it, they are paying for it.  They get the benefit.... The bourgeoisie negro gets to be on your panels....**

* * *

**The win for them is that their phone will be ringing, and you'll call them and ask them to be on their panel**.  Or a vice president at one firm will get recruited to become an executive vice president at another firm because they have a diversity problem.  And they get to [clapping sound] wash their hands.  You guys know the book "The 48 Laws of Power"?  C'mon, you're a lawyer and you don't know that book?  It's like the devil's book. The 48 Laws of Power.  It's like 48 laws of exercising power, and one of them is **"don't get your hands dirty when you commit an act,  get a proxy to do it."  So I'm the pawn, I'm the proxy.  And so they get to keep their hands clean, all they have to do is keep the money flowing**.

(Compl. ¶ 18) (emphasis in original).

18.     In a thinly-veiled manner, he also threatened the Bisnow executives with physical harm by telling them, for no other apparent reason, that he and his brother had once beaten some boys senseless with liquor bottles:

[W]hat they didn't see was the bottle of-- you don't know this, but a bottle of Boone's Farm, that was like malt liquor back then, I had a bottle of Boone's Farm in me and I crashed it over the guy's head.  And my brother hit the guy with a bottle of Red Irish Rose.  We hit the biggest kid first and then one of them ran.  And then all we did was stomp these kids, and we like banging 'em, bangin 'em, kickin 'em, beaten 'em, blood all over us....  And then we took off the shirts and ran back to Bushwick, Brooklyn where we lived.  And when I look back on that, I say stup-- suppose that kid's throat woulda got slashed, suppose his head would have hit the side walk.  There's some person now, who got, guy took one punch, hit him once, hit his head the ground, brain dead, died.

(Compl. ¶ 19).

19.     In addition, Lopez-Pierre sought to convince Bisnow that it had no means of fighting

back against him with litigation because, notwithstanding the fact that he was being paid "very well"

to extort Bisnow, he fraudulently hides his assets so as to be judgment-proof:

> I'm being compensated very well to be an a\*\*hole.  And one of the reasons I was
> selected, ... is that I'm judgment-proof.  What it means is that even if you file a
> lawsuit or whatever, whatever, I have no assets with my name on it that anybody can
> attach * * * I never touch the money.  So the real estate diversity PAC, it'll have very
> little money in there 'cause none of the money comes from there.  Because somebody
> could – some judge could seize that money.  * * *  I will never touch the money.
>
> * * *
>
> My name will be on none of the documents; I will own nothing, um, and, which is
> very specific, I have an ex-wife, so I don't need to pay more in child support, so
> nothing will ever be in my name.  Like I said, I make sure I stay judgment-proof.  I
> am poor.  If you don't believe me, ask my ex-wife * * * [E]verything is
> interchangeable, so the PAC supports our business interests, the fund supports its
> business....

(Compl. ¶ 20).

20.     In sum, Lopez-Pierre has and continues to seek to extort Bisnow into giving up its

valuable and transferable right to use event speaking opportunities as a means of selling event

sponsorships.  (Compl. ¶ 21).

B.      The Details of Lopez-Pierre's Extortion Scheme

21.     In the summer of 2019, Lopez-Pierre started including Bisnow executives on various

mass emails in which he accused at least one member of the New York real estate industry of racial

discrimination against "Black and Hispanic real estate professionals."  (Compl. ¶ 22).

14

22.     On October 4, 2019, Bisnow executives received a mass email from Lopez-Pierre announcing that he was planning to create the Realty Diversity PAC which, as yet, did not have a name:

> I, Thomas Lopez-Pierre am going to establish a 501(c)(4) political action committee - PAC (name to be announced) to raise money to launch a social media and grassroots-boots-on-the-ground campaign to advocate (with direct action protests at corporate offices) for racial and gender diversity, equity and inclusion with regard to hiring and leadership within the real estate industry in New York, New Jersey and Connecticut.

(Compl. ¶ 23).

23.     By October 10, 2019, Lopez-Pierre had announced that the Real Estate Diversity PAC was operational by sending out a mass email to "17,312 Black and Hispanic Professionals (and about 1,000 Members of the Media and White Real Estate Professionals)," which included some Bisnow executives.   The email was sent from a newly-created "info@realestatediversitypac.org" email address using a domain that had been registered on October 8, 2019.   The email included an "Open Letter" to a member of the real estate community, stating, *inter alia*:

> The Real Estate Diversity PAC is going to launch a year-long grassroots-boots-on-the-ground-direct-action-protest-campaign against your firm: _____ for **being RACIST against Black, Hispanic and Asian people and Sexist against women**.
>
> My name is Thomas Lopez-Pierre and I am the Treasurer of The Real Estate Diversity PAC.
>
> **The Real Estate Diversity PAC will target your corporate office, home and house of worship and the homes and houses of worship of the senior executives** at your firm....

(Compl. ¶ 24) (emphasis in original).

24.     The "Real Estate Diversity PAC" did not actually exist.   (Compl. ¶ 24).

25.     On October 11, 2019, Bisnow received an email from Lopez-Pierre informing it that, prior to the formation of the Real Estate Diversity PAC, he had forced one of Bisnow's competitors to name him as the "Co-Chairperson of their Diversity Advisory Board."  (Compl. ¶ 25).

26.     As explained by Lopez-Pierre:

 I made the strategic decision NOT to publicly target [     ], the event producer BUT their title sponsor (**always go after the money - smile**) via Twitter and email (see tweet below): International commercial real estate firm [   ].

And within days of my online social media and email protest campaign that included a promise to launch a grassroots-boots-on-the-ground organizing campaign at the corporate New York Offices of [     ], the **company pulled out of their role as titled sponsor of the New York Multi-family Summit**.

* * *

Now that **I, Thomas Lopez-Pierre had Green Pearl's attention** (smile), I accepted their "generous" offer to have me serve as the **Co-Chairperson of their Diversity Advisory Board for their upcoming New York Multi-Family Summit**.

(Compl. ¶ 25) (emphasis in original).

27.     On November 11, 2019, Lopez-Pierre started his extortion campaign against Bisnow by sending identical letters to two planned sponsors of an upcoming Bisnow event which, *inter alia*, threatened violence by informing Bisnow that, unless his demands were met, **he would "buy tickets for recently incarcerated Black and Hispanic men to attend [the event] in order to disrupt and hold up banners**...."  (Compl. ¶ 26)  (emphasis in original).  The letter went on to state:

Trust me you will just love the **video on social media of police officers dragging a group of kicking and screaming recently incarcerated Black and Hispanic men** out of real estate events for protesting the lack of Black, Hispanic, Asian, and Women speakers.

* * *

16

When I am done with your name and that of your firm in social media and direct action protests, your professional brand and that of your firm within the commercial real estate industry in tri-state New York will stand for **[you] are RACIST against Black and Hispanic real estate professionals**.

On the other hand, I want to be your new best real estate professional friend!

(Compl. ¶ 26) (emphasis in original).

28.     This was the same tactic -- threatening its sponsors -- which Lopez-Pierre had successfully used against one of Bisnow's competitors.  (Compl. ¶ 26).

29.     On December 2, 2019, Lopez-Pierre copied Bisnow on a mass email he had sent "[t]o 10,000 Black and Hispanic Professionals (Lawyers, Real Estate, Medical, Finance) and 4,000 White Real Estate Professionals and the media."   The email threatened that any person or company participating in a Bisnow event would suffer the following fate: "Our protestors will visit the corporate offices, homes and houses of worship of the speakers and sponsors ... and yell that 'XYZ' person and/or firm is RACIST and SEXIST, until NYPD Officers arrive and drag them out kicking and screaming (which will be recorded on cellphones for social media)."  (Compl. ¶ 27).

30.     Thereafter, Lopez-Pierre sent out similar threatening emails.  Faced with these threats and willing to consider the unlikely possibility that Lopez-Pierre might add value to its ongoing diversity efforts, Bisnow executives agreed to meet with him on February 20, 2020.  The relevant details concerning that meeting are explained above, but having met with him, Bisnow concluded that Lopez-Pierre was a charlatan and decided not to engage with him further.  (Compl. ¶ 28).

31.     On March 3, 2020, Lopez-Pierre sent a mass email stating, *inter alia*:

As of February 23, 2020, The Real Estate Diversity PAC will NO longer engage in direct action protests -- we are restructuring ourselves into a research, political fundraising and public relations organization.

17

The Real Estate Diversity PAC will be tasked with publicizing the names of White Real Estate Executives found guilty of "Economic Racism" against Black and Hispanic people within the commercial real estate industry (i.e.: protected speech).

The word on the street is that a new, more radical organization: The Commercial Real Estate Intelligence Alliance (CREIA), recently purchased personal data of Senior Executives at a major commercial real estate firm (New York):

1 - home addresses;

2 - cell phone numbers with emergency contacts;

3 - date of births;

4 - social security numbers;

5 - compensation reports.

The Commercial Real Estate Intelligence Alliance (CREIA) operates:

1 - as a secret intelligence/direct action organization (no website);

2 - targets White Real Estate Executives without ANY warning;

3 - uses cash and "other inducements" (such as blackmail and honey trapping ) to recruit agents/spies within major commercial real estate firms.

(Compl. ¶ 29).

33.    There is only one member of the CREIA: Lopez-Pierre.  Taking Lopez-Pierre at his word that a bribe was paid, he plainly paid it.  While Lopez-Pierre did not identify the victims of his bribery, the emails were sent in an effort to scare Bisnow and others that they would suffer fate unless they met Lopez-Pierre's demands.  (Compl. ¶ 30).

33.    On March 11, 2020, Lopez-Pierre sent a mass email with a subject line stating: "Coronavirus Inflected Protesters At Commercial Real Estate Events?"  It then went on to assure Bisnow that, on behalf of the Real Estate Diversity PAC, he was "deny[ing] any involvement with

any upcoming plans to send coronavirus inflected protesters" to Bisnow events.  This was a threat communicated in a backhanded way.  (Compl. ¶ 31).

34.     On or about March 20, 2020, Lopez-Pierre started a Real Estate Diversity PAC Twitter Page, with an address of "@RacistBisnowNYC," which publicized messages to multiple planned Bisnow event speakers and sponsors asking why they were involved with Bisnow even though it is "Sexist towards women and Racist against Black, Hispanic and Asian people...." (Compl. ¶ 32).

35.     On April 4, 2020, Lopez-Pierre sent a mass email containing a public letter to the Managing Partner of Bisnow's parent threatening that, unless Bisnow's CEO were fired, the Real Estate Diversity PAC would "launch '**non-violent aggressive protest campaigns**' against your Corporate Sponsors (and at your future industry events)" so that "[i]n less than a year, Bisnow as a corporate brand will stand for '**Economic RACISM**' against Black, Hispanic and Asian people and 'Economic Sexism' against Women!"  (Compl. ¶ 33).

36.     On April 4, 2020, Lopez-Pierre again sent a mass email containing a threat to one of Bisnow's event sponsors that if it "sponsors any future events with Bisnow, your firm and senior executives **WILL BE TARGETED** for 'non-violent aggressive protest campaigns' (in person and on social media)."  (Compl. ¶ 34).

37.     On April 6, 2020, Lopez-Pierre sent a similar letter, publicized in a mass email, to another sponsor of a Bisnow event.  (Compl. ¶ 35).

38.     On April 8, 2020, Lopez sent an email to a number of Bisnow sponsors (copy to Bisnow) stating that "**I do NOT give a FU*K about what White people think of me or being liked by White people**" (emphasis in original), and informing the sponsors that:

19

The Real Estate Diversity PAC plans to target Bisnow's corporate sponsors with '**non-violent aggressive protest campaigns'** (corporate offices, homes and houses of worships).

\* \* \*

As you know Bisnow has refused to end their RACIST and SEXIST business practice of excluding Black, Hispanic, Asian and Women event speakers.

\* \* \*

I have the moral high ground and in the end Bisnow will have to end their RACIST and SEXIST business practice of excluding Black, Hispanic, Asian and Women event speakers.

The ONLY question is when, I prefer sooner rather than later (smile).

All The Real Estate Diversity PAC has to do is keep creating "incidents" (online and offline) that draws attention (puts the HOT spot light) on Bisnow's corporate sponsors in the same way as Rev. Dr. Martin Luther King, Jr. did during the 1960's.

(Compl. ¶ 36) (emphasis in original).

39.     Also on April 8, 2020, Lopez-Pierre sent out a mass email announcing that the Real

Estate Diversity PAC had declared:

1 - **Boycott of ALL White Male Event Speakers** at Bisnow events (online or in-person) in Tri-State New York.

2 - Year-long campaign to get YOU to fire Will Friend as CEO of Bisnow;

3 - Former gang members will be hired to implement "**non-violent aggressive protest campaigns**" (corporate offices, homes and houses of worships) against those White Male Event Speakers that violate the Boycott of Bisnow.

(Compl. ¶ 37).

40.     On April 13, 2020, Lopez-Pierre sent an announced sponsor of a future Bisnow event

an open letter on a mass email, stating:

Are YOU RACIST against Black and Hispanic people?

20

I see that you are advertised to speak on a Bisnow Webinar....

Please be advised that you and your firm will be subjected to "non-violent aggressive protest campaigns" (corporate offices, homes and houses of worships and on social media) if you as a White Male Event Speaker violate the Boycott of Bisnow.

B: If The Real Estate Diversity PAC is unable to locate YOU as the White Male Event Speaker that violated the Boycott of Bisnow, [ one ] **White Male Senior Executive** at your firm (senior executives only) will be selected to take your place at being subjected to a "**non-violent aggressive protest campaign**" (corporate offices, homes and houses of worships and on social media).

**You have been warned**.

* * *

**Cancel your appearance on April 23, 2020 at Bisnow's online** Town Hall event - if YOU would like to avoid the unnecessary public relations drama of a "non-violent aggressive protest campaign"!

Over the next 12 months, **we plan on targeting as many Bisnow's corporate sponsors and White Male Event Speakers** as possible - it does NOT have to be your firm.

You're paying Bisnow for a "positive branding opportunity"!

BUT instead, YOU or **[ one ] White Male Senior Executive at your firm ...** is going to be targeted for a "non-violent aggressive protest campaign" (i.e.: video on YouTube)....

(Compl. ¶ 38) (emphasis in original).

41.     On April 23, 2020, Lopez-Pierre sent a similar open letter by mass email to three individuals scheduled to speak at a Bisnow event.  (Compl. ¶ 39).

42.     The property which Lopez-Pierre attempted to obtain from Bisnow -- the commercially valuable right to choose speakers for its panels -- belongs to Bisnow and is transferable.  (Compl. ¶ 40).

43.     Lopez-Pierre attempted to obtain Bisnow's property with its consent by wrongful threats of force and physical violence in the form of his threats, *inter alia*, to send "recently incarcerated Black and Hispanic men to attend [Bisnow] events, in order to disrupt" so that police officers would then need to "drag[] a group of kicking and screaming recently incarcerated Black and Hispanic men out of [its] events...."  (Compl. ¶ 41).

44.     Lopez-Pierre also attempted to obtain Bisnow's property with its consent by wrongfully inducing fear on the part of Bisnow that it would suffer economic harm -- *i.e.*, that Bisnow's business would be destroyed unless it acceded to his demands because he would "go after its economics" and "kill the brand."  (Compl. ¶ 42).

45.     The natural consequences of Lopez-Pierre's conduct as described above affected commerce because, *inter alia*, Bisnow presents its media planning events in locations throughout the world.  In addition, New York event sponsorships are sold to companies which conduct business in numerous states, and its events in New York are marketed to and attended by individuals and companies from states other than New York.  (Compl. ¶ 43).

       v.    *Extortion of Bisnow's Competitors*

46.     Lopez-Pierre has also extorted or attempted to extort Bisnow's competitors in the same manner it has sought to extort Bisnow.  (Compl. ¶ 44).

      vi.    *Bribery*

47.     On March 3, 2020, as detailed above, Lopez-Pierre stated that the CREIA (which was actually Lopez-Pierre himself) had bribed an employee of a "major commercial real estate firm (New York)" in return for the "personal data of [its] Senior Executives."  Moreover, (a) the amount of the

bribe exceeded $1,000, and (b) it caused economic harm to the firm and its executives in an amount
exceeding $250. (Compl. ¶ 45).

vii.     *Wire Fraud in Connection with the GoFundMe Campaign*

48.     In March and/or April 2017, on specific dates peculiarly within Lopez-Perez's
knowledge, Lopez-Pierre raised funds for his 2017 Campaign through a GoFundMe web page called
"Stop Thomas Lopez-Pierre Hate Campaign" which he had created and maintained. (Compl. ¶ 46).

49.     On or about April 26, 2017, Lopez-Pierre described the GoFundMe solicitations to
the *New York Post* as a "bait and switch," further stating that "I intend to use the money to pay for
my marketing expenses. The people who are doing this oppose me. I thank them for their support."
(Compl. ¶ 47).

50.     Lopez-Pierre's statement to the *New York Post* was an admission that, in violation
of 18 U.S.C. § 1343, he had devised a scheme to obtain money by means of intentionally false
representations. As a result of this scheme, Lopez-Pierre knowingly and intentionally obtained
$5,781 in contributions from individuals whom he knew "opposed" him and were unwittingly
contributing their money to Lopez-Pierre's 2017 campaign because Lopez-Pierre had intentionally
deceived them. (Compl. ¶ 48).

51.     It was reasonably foreseeable to Lopez-Pierre that his scheme would be accomplished
through interstate wire transmissions because, on information and belief, the monies contributed to
his GoFundMe campaign were collected by GoFundMe in California, which, after it deducted its
2.9% payment-processing fee on each donation, along with 30 cents for every donation, then sent
the money by wire to Lopez-Pierre in New York. (Compl. ¶ 49).

        viii.     <u>*Wire Fraud in Connection with the Real Estate Diversity PAC*</u>

52.     Commencing on or about October 2019, Lopez-Pierre engaged in a scheme to defraud by soliciting contributions to the Real Estate Diversity PAC by, *inter alia*, making the materially false representation that it (a) was an actual entity, and (b) was a 501(c)(4) organization -- representations which Lopez-Pierre necessarily knew were false and which were made to induce contributions by false representations.  (Compl. ¶ 50).

53.     Lopez-Pierre engaged in the following activities:

        a.     On October 10, 2019, he sent out a mass email soliciting contributions for the "Real Estate Diversity PAC," and providing a link to its purported web page at "realestatediveritypac.org."   The website falsely claimed that the Real Estate Diversity PAC is a "501(c)(4) political action committee[], [which is] NOT required to disclose the names and addresses of their donors on IRS tax documents.";

        b.     On October 11, 2019, he sent out a mass email, in his supposed capacity as the "Treasurer" of the Real Estate Diversity PAC, which embedded a letter he had sent to a member of the New York real estate industry.  The letter falsely represented that the Real Estate Diversity PAC exists and that it was a "501(c)(4) political action committee."   It also provided a link to its purported web page at "realestatediveritypac.org."   The website solicited funds by falsely claiming that the Real Estate Diversity PAC exists and that it is a "501(c)(4) political action committee[], [which is] NOT required to disclose the names and addresses of their donors on IRS tax documents."

Lopez-Pierre's email stated: "**This Email Was Sent To 10,000 Black and Hispanic Professionals (Lawyers, Real Estate, Medical, Finance) and 4,000 White Real Estate Professionals and the media**."  (Emphasis in original);

c.    On December 2, 2019, he sent out a mass email, in his supposed capacity as the "Treasurer" of the Real Estate Diversity PAC, which embedded a letter he had sent to a member of the New York real estate industry.  The letter falsely represented that the Real Estate Diversity PAC exists and that it was a "501(c)(4) political action committee."  It also provided a link to its purported web page at "realestatediveritypac.org."  The website solicited funds by falsely claiming that the Real Estate Diversity PAC is a "501(c)(4) political action committee[], [which is] NOT required to disclose the names and addresses of their donors on IRS tax documents."  Lopez-Pierre's email stated: "**This Email Was Sent To 10,000 Black and Hispanic Professionals (Lawyers, Real Estate, Medical, Finance) and 3,000 White Real Estate Professionals and the media**."  (Emphasis in original);

d.    On February 25, 2020, Defendant sent out a mass email, in his supposed capacity as the "Treasurer" of the Real Estate Diversity PAC, which embedded a letter he had sent to "Senior White Commercial Real Estate Executives."  The letter falsely represented that the Real Estate Diversity PAC exists and that it was a "501(c)(4) political action committee."  It also provided a link to its purported web page at "realestatediveritypac.org."  The

website solicited funds by falsely claiming that the Real Estate Diversity PAC exists and that it is a "501(c)(4) political action committee[], [which is] NOT required to disclose the names and addresses of their donors on IRS tax documents." Lopez-Pierre's email stated: "**This Email Was Sent To 10,000 Black and Hispanic Professionals (Lawyers, Real Estate, Medical, Finance) and 3,000 White Real Estate Professionals and the media**." (Emphasis in original);

e.      On March 11, 2020, Defendant sent out a mass email, in his supposed capacity as the "Treasurer" of the Real Estate Diversity PAC, which embedded a letter he had sent to "Commercial Real Estate Event Producers and Commercial Real Estate Firms" with the following subject line: "**Coronavirus Inflected Protesters At Commercial Real Estate Events?**" (Emphasis in original).  The email provided a link to the Real Estate Diversity PAC's purported web page at "realestatediveritypac.org."  The website solicited funds by falsely claiming that the Real Estate Diversity PAC exists and that it is a "501(c)(4) political action committee[], [which is] NOT required to disclose the names and addresses of their donors on IRS tax documents." Lopez-Pierre's email stated: "This Email Was Sent To 10,000 Black and Hispanic Professionals (Lawyers, Real Estate, Medical, Finance) and 3,000 White Real Estate Professionals and the media.";

f.      On March 21, 2020, Defendant sent an email to "10,000 Black and Hispanic Professionals and 3,000 White Real Estate Professionals (Tri-State-New

York)!" which provided a link to the Real Estate Diversity PAC's purported web page at "realestatediveritypac.org." The website solicited funds by falsely claiming that the Real Estate Diversity PAC exists and that it is a "501(c)(4) political action committee[], [which is] NOT required to disclose the names and addresses of their donors on IRS tax documents."; and

g.    On April 4, 2020, he sent out a mass email, in his supposed capacity as the "Treasurer" of the Real Estate Diversity PAC, which embedded a letter he had sent to Bisnow's CEO. The letter provided a link to its purported web page at "realestatediveritypac.org." The website solicited funds by falsely claiming that the Real Estate Diversity PAC exists and that it is a "501(c)(4) political action committee[], [which is] NOT required to disclose the names and addresses of their donors on IRS tax documents." Lopez-Pierre's email stated:

**NOTE: This email was sent to (Tri-State New York)**:

1 - 3,000 White real estate professionals (of which 1,000 are women);

2 - 1,000 employees of Bisnow Corporate Sponsors;

3 - 500 White women partners at major law/accounting firms;

4 - 10,000 Black and Hispanic professionals.

(Compl. ¶ 51) (emphasis in original).

54.    Lopez-Pierre knew that his fraudulent scheme would be accomplished through interstate emails because, by his own admission, he sent his emails to thousands of people in the "Tri-State New York" area. (Compl. ¶ 52).

27

ix.     *Lopez-Pierre has Engaged in a Pattern of Racketeering*

55.     Lopez-Pierre's acts of racketeering constitute a "pattern of racketeering" within the meaning of 18 U.S.C. § 1961(5), because they are (a) vertically related, (b) horizontally related, and (c) they satisfy the requirement of both close-ended and open-ended continuity.  (Compl. ¶ 53).

56.     Lopez-Pierre's crimes are horizontally related because, *inter alia*, (a) they are all committed for the purpose of enriching Lopez-Pierre; (b) they have the same participant -- Lopez-Pierre; (c) they are all committed through mass emails and/or internet solicitations; and (d) Lopez-Pierre uses his website in his mass emails to commit his various crimes.  (Compl. ¶ 54).

57.     Lopez-Pierre's crimes are also vertically related because (a) he was able to commit his acts of racketeering by reason of his control over the TLP Enterprise's affairs, and (b) all of his criminal activity was related to the affairs of the TLP Enterprise.  (Compl. ¶ 55).

58.     Lopez-Pierre's racketeering activity dates back to at least April of 2017, thereby establishing closed-ended continuity.  Moreover, given that Lopez-Pierre (a) was seeking to extort Bisnow and others as late as April 2020, and (b) is still seeking contributions to the Real Estate Diversity PAC through his website, there is also open-ended continuity because he poses a threat of continued criminal activity.  (Compl. ¶ 56).

x.     *Bisnow has been injured in its Business and Property*

59.     By reason of Lopez-Pierre's racketeering activity -- particularly his threats that he would arrange for (a) protesters to harass executives of the sponsors of Bisnow's events by appearing at their homes, offices and houses of worships, and (b) "recently incarcerated Black and Hispanic men" to disrupt prospective sponsor's Bisnow events -- he has caused and will continue to cause

28

Bisnow to lose revenue and profits. (Compl. ¶ 57).   Damages are addressed further *infra* in Subpoint(E).


   C.   **Facts Relating To Plaintiff's Claim For Trade Libel**

   60.   Defendant made false statements in writing to third parties which adversely affected Plaintiff in its trade, business, and profession.  (Compl. ¶ 60).

   61.   These false statements -- that Plaintiff is "racist" and "sexist" -- impugn the basic integrity and competence of Plaintiff's business.  (Compl. ¶ 61).

   62.   Defendant knows that his defamatory publications are false, or at a minimum, he has been reckless in his disregard for the truth of his statements.  For example, during a telephone call with a Bisnow employee, Lopez-Pierre admitted that "I do not think Bisnow is racist ... but I have to feed my family."  (Compl. ¶ 62).

   63.   As a result of Defendant's trade libel, Plaintiff has been damaged as addressed further in Subpoint (E).

   D.   **Facts Relating To Plaintiff's Claim For Tortious Interference with Business Expectancy**

   64.   Plaintiff had an expectation of economic advantage by virtue of its professional and economic relationships with sponsors and speakers -- whose identities are trade secrets known to Bisnow and which it will reveal to Lopez-Pierre upon the Court entering a confidentiality order. Defendant intentionally interfered with Plaintiff's expectation of economic advantage by wrongful means in that his interfering conduct was criminal in violation of 18 U.S.C. § 1951.  (Compl. ¶ 65).

65.     As a result of Defendant's intentional interference with Plaintiff's expectation of economic advantage, Plaintiff has been damaged immediately below.

E.     **Facts Relating to Damages**

66.     Bisnow's costs are fixed and therefore any lost revenue is all profit except for an industry standard 10% commission.  (*See* the accompanying October 29, 2020 Declaration of Christoprer Bushnell ("Bushnell Dec."), Director of the Northeast for Bisnow, at ¶ 4).

67.     Lopez-Pierre has proximately caused damage to Bisnow's reputation in the amount of $7,060,023.  (*See* the accompanying October 29, 2020 Declaration of Tyler Fisher, Vice President of Sales for Bisnow, at ¶¶ 4-5 and the referenced Exhibit).  However, this figure should be reduced by 10% to account for the sales commission.  Accordingly,  the damage to Bisnow's reputation comes to $6,354,020.70, which is calculated by subtracting 10% of $7,060,023 ($706,002.30) from $7,060,023, which equals $6,354,020.70.

68.     By the loss of three specific clients, Bisnow was damaged in the amount of $108,927.14 for 2020 and $653,562.84 through the end of 2025.  (Bushnell Dec. at ¶¶ 5-18 and the exhibits referenced therein).  However, this figure should be reduced by 10% to account for the sales commission, which comes to a total of $588,206.56.

69.     Bisnow was also suffered an annual loss in contracts proximately caused by Defendant's actionable conduct for customers within the New York, which totals $236,180.  (*See* Bushnell Dec., at ¶ 19).  This figure should also be reduced by 10%, which comes to $212,562.

## PROPOSED CONCLUSIONS OF LAW

### A.   The Complaint States a Claim Under the RICO Statute

70.   "To establish a civil RICO claim, a plaintiff must allege '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.'" *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (citation omitted).

71.   The Complaint sufficiently alleges an association-in-fact RICO Enterprise. "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Paragraphs 10 and 11 of the Complaint adequately plead the association-in-fact enterprise, the TLP Enterprise.

72.   The Complaint has adequately alleged a pattern of racketeering activity.

73.   **First**, the Complaint adequately pleads that Lopez-Pierre committed crimes which are defined as racketeering acts under 18 U.S.C. § 1961(1) -- violations of the Hobbs Act (18 U.S.C. § 1951) and the wire fraud statute (18 U.S.C. § 1343).

74.   The racketeering acts which Plaintiff contends injured it are violations of the Hobbs Act, which is violated by, *inter alia*, affecting commerce by attempting to obtain "property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Here, each of these elements is adequately pleaded in the Complaint:

   a.   Intangible rights are "property" within the meaning of the Hobbs Act, *see United States v. Silver*, 864 F.3d 102, 114 (2d Cir. 2017), so long as the rights are

"'something of value from'" the plaintiff which the defendant "could exercise, transfer, or sell," *Scheidler v. NOW, Inc.*, 537 U.S. 393, 405 (2003) (citation omitted); *see Sekhar v. United States*, 570 U.S. 729, 736-37 (2013).  Paragraphs 15-16 and 21 of the Complaint sufficiently identify the property which Lopez-Pierre has attempted to obtain from Bisnow with its consent;

b.  The Hobbs Act proscribes both implicit and explicit threats of violence.  *See, e.g., United States v. Abelis*, 146 F.3d 73, 83 (2d Cir. 1998).  Further, "the element of 'fear' required by the Act can be satisfied by putting the victim in fear of economic loss."  *DeFalco v. Bernas*, 244 F.3d 286, 313 (2d Cir. 2001) (citation and some internal quotation marks omitted).  Indeed, where a Hobbs Act claim is predicated upon fear of economic harm, "inducing a party to consent to part with property ... does not require that such fear be 'created by implicit or explicit threats.'"  *United States v. Coppola*, 671 F.3d 220, 241 (2d Cir. 2012) (citation omitted).  Paragraphs 16-19 and 22-43 of the Complaint adequately allege Lopez-Pierre's threats of both violence and use of fear in an effort to secure Bisnow's property; and

c.  The Hobbs Act also requires proof that the defendant's conduct had "'a very slight effect on interstate commerce.'"  *United States v. Elias*, 285 F.3d 183, 188 (2d Cir. 2002) (citation omitted).  "Even a potential or subtle effect on commerce will suffice."  *Id*.  Paragraph 43 of the Complaint adequately pleads this element of the offense.

75.  **Second**, in order to meet RICO's "pattern of racketeering" element, a "plaintiff must plead at least two predicate acts ... and must show that the predicate acts are related and that they

amount to, or pose a threat of, continuing criminal activity[.]"  *GICC Capital Corp. v. Tech. Fin. Grp.*, 67 F.3d 463, 465 (2d Cir. 1995).  Racketeering acts must be both vertically and horizontally related.  *Reich v. Lopez*, 858 F.3d 55, 61 (2d Cir. 2017).  They are vertically related when "the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise."  *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010).  "[P]redicate acts are *horizontally* related when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *Reich*, 858 F.3d at 61.  (Citation omitted) (Emphasis in original).

76.     Also , "a plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.*, past criminal conduct 'extending over a substantial period of time')."  *GICC Capital*, 67 F.3d at 466.  In the Second Circuit, predicate acts must span a minimum of two years to meet the closed-ended continuity requirement.  *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004).  Further, while a plaintiff cannot recover damages for horizontally and vertically related racketeering acts directed at and harming other victims, those acts can nonetheless be relied upon in pleading closed-ended continuity.  *See, e.g.*, *Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.*, 2009 U.S. Dist. LEXIS 91291, at *25 (E.D.N.Y. Sept. 30, 2009).

77.     Bisnow has met all of these pleading requirements.  (*See* summary at Paragraph 56 of the Complaint).

78.     **Third**, Bisnow must also plead that Lopez-Pierre participated in the TLP Enterprise through a pattern of racketeering; Bisnow must plead that he participated in the "operation and management" of the TLP Enterprise, *see D'Addario v. D'Addario,* 901 F.3d 80, 103 (2d Cir. 2018), *i.e.*, that he "played '*some* part in directing the enterprise's affairs....'"  (Emphasis in original). Paragraph 12 of the Complaint meets this pleading requirement.

79.     **Fourth**, RICO's "injury to business or property" element is met by pleading that the defendant's racketeering acts proximately caused the plaintiff to suffer economic injury.  *See Anza v. Ideal Steal Supply Corp.*, 547 U.S. 451, 456 (2006).  Paragraph 65 of the Complaint is sufficient on this score.  Plaintiff has produced proof of economic injury in the Busnhell Dec. caused by the loss of three identified customers in the amount of $653,562.84, which is then reduced by 10%, coming to $588,206.56.  The Bushnell also provides evidence of lost contracts in the New York market totaling $236,180, which is also reduced by 10%, coming to $212,562.  These two damages amounts, $588,206.56 and $212,562, come to a total of $800,768.56.

80.     While the law is not entirely settled, it does not appear that damage to reputational injury is available under RICO.  *See Kimm v. Chang Hoon Lee*, 2005 US Dist LEXIS 727, at *15, n 7 [SDNY Jan. 13, 2005]) ("Damage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c).") (*quoting Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 187 F.3d 941, 954 (8th Cir. 1999).  *But see Dandong Old N.-East Agric. & Animal Husbandry Co. v Gary Ming Hu*, 2017 US Dist LEXIS 122471, at *26, n 6 (S.D.N.Y. Aug. 3, 2017) ("While the issue is far from clear, for the purposes of this Opinion, the Court assumes that reputational harm, at least in the highly particularized form alleged by Plaintiff, is cognizable under RICO.").  It is also well-settled that "[a plaintiff may not

recover twice for the same injury." *See Phelan v. Local 305 of United Ass'n of Journeymen*, 973 F.2d 1050, 1063 (2d Cir. 1992)   However, as addressed *infra*, in Subpoint(B), damages for injury to reputation are available under Plaintiff's libel claim.

81.     Treble damages, attorneys' fees, and costs are mandatory under RICO.  18 U.S.C. 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefor in any appropriate United States district court and <u>shall</u> recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" (Emphasis supplied).  The Second Circuit "has affirmed district court awards of treble damages pursuant to RICO in default judgment actions." *Gragg v. Int'l Mgmt. Group (UK), Inc*., 2009 U.S. Dist. LEXIS 35736, at *8 (N.D.N.Y. April 24, 2009) (citing *D'Orange v. Feely*, 101 F.3d 1393 (2d Cir. 1996) (affirming district court's denial of motion to set aside entry of default and award of treble damages for default judgment pursuant to RICO).  The Second Circuit has also "made clear that a hearing to determine the amount of damages with regard to a default judgment is not required 'as long as it [is] ensured that there [is] a basis for the damages specified in the default judgment.'" *Group III Capital, Inc. v. Parasol Group, Ltd.*, 2003 U.S. Dist. LEXIS 6865, at *4-5 (S.D.N.Y. April 22, 2003) (quoting *Fustok v. ContiCommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).  *See also* Fed. R. Civ. P. 55(b)(2) ("the court may conduct such hearings or order such references as it deems necessary and proper" in order to determine the amount of damages). In *Group III Capital*, the court directed defendants to pay Group III "the total sum of $ 7,978,967.33, which represents treble damages in the amount of $ 7,900,236.00 plus attorneys' fees and costs of suit in the amount of $ 78,731.33." 2003 U.S. Dist. LEXIS 6865, at *9. *See also Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, 2013 U.S. Dist. LEXIS 6668, at *31-32 (E.D.N.Y. January 16, 2013)

(on a default judgment, awarding $311,152.29 and $18,588.00 in attorneys' fees, respectively, to two law firms, but applying a 10% reduction to attorneys' fees to account for hours spent on non-RICO claims).  Punitive damages are not available for RICO claims.  *Charron v. Pinnacle Group NY LLC*, 874 F. Supp. 2d 179, 195 (S.D.N.Y. 2012).

82.     To be entitled to an award of reasonable attorneys' fees, the RICO plaintiff bears the burden "to document 'the hours reasonably spent by counsel, and thus must support its request by providing contemporaneous time records reflecting, for each attorney and legal assistant, the date, the hours expended, and the nature of the work done.'"  *Johannes Baumgartner Wirtschafts-Und Vermogensberatung GmbH v. Salzman*, 2013 U.S. Dist. LEXIS 126955, at *50 (E.D.N.Y. March 8, 2013), *R&R not adopted on other grounds by*, 2013 U.S. Dist. LEXIS 125528 (quoting *Cho v. Koam Medical Services PC*, 524 F. Supp. 2d 202, 209 (E.D.N.Y. 2007)).  Plaintiff is required to establish a reasonable hourly rate "using the prevailing hourly rates" in the SDNY.  *See Johannes Baumgartner*, 2013 U.S. Dist. LEXIS 126955, at *52.

83.     The hourly rates charged by Plaintiff's counsel are consistent with those approved in *MSC Mediterranean Shipping Co. v. Forsyth Kownacki LLC*, 2017 U.S. Dist. LEXIS 49540, *7-8 (S.D.N.Y. March 30, 2017) ("Plaintiff charged at rates ranging from $210.75 (€200) to $437.30 (€415) per hour for non-legal staff; $569.02 (€540) to $753.42 (€715) per hour for associates; and $874.60 (€830) to $1,048.47 (€995) per hour for partners at Gibson Dunn.  These rates are reasonable under the circumstances, given the experience and work performed  by the particular individuals."

> In *U.S. Bank N.A. v. Dexia Real Estate Capital Mkts*., 2016 U.S. Dist. LEXIS 165628 (S.D.N.Y. Nov. 30, 2016), the court approved rates ranging from $250 per hour to $1,055 per hour.  The court explained that, "[a]s the Court has noted in approving

billing rates in another complex commercial litigation, 'partner billing rates in excess of $1,000 an hour[] are by now not uncommon in the context of complex commercial litigation.'" *Id*. at *26, (*quoting Themis Capital v. Democratic Republic of Congo*, 2014 U.S. Dist. LEXIS 124208 (S.D.N.Y. Sept. 4, 2014)).

*Vista Outdoor, Inc. v. Reeves Family Trust*, 2018 U.S. Dist. LEXIS 102224, at *15 (S.D.N.Y. May 24, 2018) (approving a $1,260 hourly rate for a partner).

84.     In addition to attorneys' fees, Plaintiff is entitled to reimbursement of expenses it paid for investigative services. *See Watson v. E.S. Sutton, Inc*., 2006 U.S. Dist. LEXIS 978873, at *40 (S.D.N.Y. Aug. 11, 2006) ("Contrary to Defendant's contention, courts in this district have awarded the cost for retaining investigators as part of litigation-related expenses.") (citing *Irish v. City of New York*, 2004 U.S. Dist. LEXIS 3770, at *8 (S.D.N.Y. Mar. 10, 2004); *Carrero v. New York City Housing Auth*., 685 F. Supp. 904, 909 (S.D.N.Y. 1988)).

85.     Here, based on agreement to a flat fee arrangement through the filing of this submission, Plaintiff's has only incurred $112,071.91 in recoverable legal fees and expenses in connection with this litigation.  (*See* the accompanying October 29, 2020 Declaration of Peter B. Schalk ("Schalk Dec."), at ¶¶ 3-7 and the exhibits referenced therein.  Therefore, Plaintiff's have submitted evidence of reasonable attorney's fees and expenses in the amount of $112,071.91.[3]

---

[3]     The Court may be inclined to reduce Plaintiff's attorneys' fees award to account for hours Plaintiff's counsel spent working on non-RICO claims.  *See Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, 2013 U.S. Dist. LEXIS 6668, *31-32 (E.D.N.Y. January 16, 2013) (on a default judgment, awarding $311,152.29 and $18,588.00 in attorneys' fees, respectively, to two law firms, but applying a 10% reduction to attorneys' fees to account for hours spent on non-RICO claims). Plaintiff respectfully submits that no reduction or, at most, a very minimal reduction, would be appropriate here.  This is so because Plaintiff's RICO claims were far and away the most complicated claims Plaintiff asserted, Plaintiff's counsel spent the vast majority of its time on these claims, and much of the work relevant to Plaintiff's RICO claims was also relevant to Plaintiff's other claims.  Furthermore, as noted in the Schalk Dec., Plaintiff's attorneys' fees would have been higher had Plaintiff's counsel billed Plaintiff at their customary hourly rates.  Instead, Plaintiff's
(continued...)

B.      **The Complaint States a Claim For Trade Libel**

86.         The tort of trade libel or injurious falsehood consists
            of the knowing publication of false matter derogatory
            to the plaintiff's business of kind calculated to prevent
            others from dealing with the business or otherwise
            interfering with its relations with others, to its
            detriment (*see*, Prosser and Keeton, Torts § 128, at
            967).  The communication must play a material and
            substantial part in inducing others not to deal with the
            plaintiff, with the result that special damages, in the
            form of lost dealings, are incurred (*see, SRW Assocs.
            v. Bellport Beach Prop. Owners*, 129 A.D.2d 328,
            331).  In pleading special damages, actual losses must
            be identified and causally related to the alleged
            tortious act....

*Waste Distillation Tech., Inc. v. Blasland & Bouck Eng'rs, P.C.*, 136 A.D.2d 633, 634 (2d Dep't

1988).

87.     Plaintiff's Complaint sufficiently alleges that Defendant publicly accused Bisnow and

its executives of being racist and sexist.  (Complaint at ¶¶ 1, 32-33, 36, 38, 61).  Defendant's

statements that Bisnow is racist and sexist are defamatory under New York law:

> [I]n light of plaintiffs' allegations that defendants stated that Morelli, a partner of the
> law firm, was a member of the Ku Klux Klan (verified complaint, ¶¶ 4, 72 [c], [d]),
> plaintiffs have sufficiently stated a cause of action for defamation *per se* (*see
> Sheridan v Carter*, 48 AD3d 444, 446-447, 851 N.Y.S.2d 252 [2d Dept 2008]
> [domestic Worker's published statements which depicted couple that formerly
> employer her as racists were defamatory *per se*]; *Herlihy v Metropolitan Museum of
> Art*, 214 AD2d 250, 261, 633 N.Y.S.2d 106 [1st Dept 1995] [complaint stated cause
> of action for slander per se where it stated that volunteers made statements that
> former coordinator was anti-Semitic and was biased in her treatment of Jewish
> volunteers]).

---

[3](...continued)
agreed to a flat fee arrangement for work through this filing.  Because Plaintiff's attorneys' fees
were, in practice, reduced by this flat fee arrangement, no further reduction to account for time spent
working on non-RICO claims is necessary.

*Morelli v. Wey*, 2016 N.Y. Misc. LEXIS 4706, *26 (Sup. Ct. N.Y. Cty. Dec. 16, 2016).

88.    The Complaint also alleges that Lopez-Pierre knows his statements to be false: "Defendant knows that his defamatory publications are false, or at a minimum, he has been reckless in his disregard for the truth of his statements.  For example, during a telephone call with a Bisnow employee, Lopez-Pierre admitted that 'I do not think Bisnow is racist ... but I have to feed my family.'" (Complaint at ¶ 62).  Based upon this allegation, the Complaint alleges "actual malice" sufficient to withstand a challenge on First Amendment grounds: "For public figures the third prong of the test for libel requires a showing of 'actual malice -- that is, with knowledge that [the statement] was false or with reckless disregard of whether it was false or not.'" *DiBella v. Hopkins*, 403 F.3d 102, 110 (2d Cir. 2005) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)) (some internal quotation marks omitted).

89.    The New York courts recognize an exception to the special damages requirement attendant to a trade libel claim "[w]here a statement impugns the basic integrity or creditworthiness of a business, ... injury is conclusively presumed." *Ruder & Finn, Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670 (1981).[4]  In this case, Lopez-Pierre has admitted that when he targets a business, he seeks to "kill [your] brand" and "go after [your] economics." (Complaint ¶ 1).  In light of the nature of Lopez-Pierre's defamatory statements, and his admission that his goal in publishing them

---

[4]    *See also John Langenbacher Co. v. Tolksdorf*, 199 A.D.2d 64, 64-65 (1st Dep't 1993) ("Here, the evidence supported the court's finding that the decedent was spreading the word among architects, contractors and others in the business that after his departure from Langenbacher, the company would have financial problems, be operated by incompetents, and would be unable to fulfill its commitments as to quality and time.  The award of general damages was not excessive and the court properly found that, as the disparagement impugned the basic integrity, creditworthiness and competence of the business, injury was presumed and no proof of special damages was required.") (Citing *Ruder & Finn, supra*).

is to "kill the brand," especially when coupled with Defendant's extortionate conduct as detailed in the Complaint (*see, e.g., id.*, at ¶¶ 22-39), Bisnow qualifies for the exception to the special damages pleading requirement. (*See Ruder & Finn, supra*). Additionally, Plaintiff has come forward with detailed proof of special damages. (*See* the Bushnell Dec. and accompanying evidence).

90.     Damage to reputation is the essence of a claim for defamation. "'[U]nlike most torts, defamation is defined in terms of the injury, damage to reputation, and not in terms of the manner in which the injury is accomplished.'" *Matthew Mills v. Bank of N.Y. Co., the Estate of J. Carter Bacot*, 2007 U.S. Dist. LEXIS 118082, at *20 (S.D.N.Y. Mar. 30, 2007) (citation omitted). Through the Tyler Dec., Plaintiff has submitted evidence that Defendant proximately caused injury to Plaintiff's reputation in the amount of $7,060,023 which is then reduced by 10% to $6,354,020.70.

91.     Plaintiff is entitled to punitive damages on its trade libel claim. According to the Magistrate Judge's Report and Recommendation in *Navika Capital Group, LLC v. Doe*, 2017 US Dist. LEXIS 2926 (E.D.N.Y. Jan. 6, 2017), which was adopted by the District Court in full, compensatory and punitive damages are available for trade libel claims brought by corporate plaintiffs:

> **Regarding the amount of punitive damages, plaintiffs request that plaintiffs Navika and Shah each receive $25,000.00, for a one-to-one ratio of punitive damages to compensatory damages. The Court finds this reasonable.** First, the Court has no trouble finding defendant's conduct to be reprehensible, as described *supra* at 20-21, 37. **Defendant acted repeatedly out of malice, even after being put on notice of the claims against him.** Additionally, the one-to-one ratio is well within the range of punitive damage awards that comport with due process. Accordingly, the Court respectfully recommends that plaintiffs be awarded $25,000.00 each in punitive damages, for a total award on their claims for defamation and trade libel of $100,000.00, comprised of $25,000.00 for each plaintiff in compensatory damages and $25,000.00 for each plaintiff in punitive damages.

*See id*. at *48-50 (emphasis supplied).

92. In *State Farm Mutual Auto Insurance Co. v. Campbell*, 538 U.S. 408 (2003), the Supreme Court explained that there are three guideposts that courts should consider in reviewing punitive damages awards: "(1) the degree of reprehensibility of defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and civil penalties authorized or imposed in comparable cases." *Id.* at 418 (citing *BMW of N. Am. v. Gore*, 519 U.S. 559, 575 (1996)). Regarding the second guidepost concerning the ratio between compensatory and punitive damages, the Court in Campbell reaffirmed that there is no "bright-line ratio which a punitive damages award cannot exceed." *Id.* at 425. However, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* The Court further noted that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* "Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Id.* (quoting *Gore*, 519 U.S. at 582). The converse is also true, so when "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

93. Defendant's conduct merits the imposition of punitive damages. Plaintiff submits that any damages which are not trebled by RICO should be accompanied by an award of punitive damages in the amount of three times actual damages.

41

**C.     The Complaint States A Claim For Tortious Interference With Business Expectancy or Prospective Economic Advantage**

94.     In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must plead that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003) (citation omitted; applying New York law).

95.     Plaintiff alleges, and Lopez-Pierre's own emails confirm, that Defendant has targeted Bisnow's sponsors and speakers with the sole intent of poisoning their business relationship with Bisnow through appallingly dishonest and unfair means. (Complaint at ¶¶ 1, 26). Indeed, Lopez-Pierre is literally calling on Bisnow's business associates to boycott it, and he explicitly threatens them with public vilification while implicitly threatening them with physical harm if they do not acquiesce. (*See* Complaint at ¶¶ 26-39). Bisnow also alleges that Defendant has been successful in his campaign to harm it financially (Complaint at ¶ 65), and Plaintiff has submitted proof with this motion of sponsors severing their relationships with Bisnow over Lopez-Pierre's conduct. (*See* Busnell Dec.). Thus, a claim for tortious interference is not only stated, but supported by evidence:

> Plaintiff has sufficiently pled all of the elements of tortious interference with prospective economic advantage. First, the pleadings assert that plaintiff had either performed move jobs for the job owners previously or submitted bids to job owners. Second, the plaintiff pleads that defendants knew of its relationships with job owners because the moving consultants were told of the bids or earlier relationship and they then informed the other defendants. Third, plaintiffs have pled that the defendants used improper means by extorting the job owners. Finally, plaintiff sufficiently pleads that defendants' actions deprived plaintiff of opportunities to bid on or win jobs.

*Advance Relocation & Storage Co. v. Local 814, Int'l Bhd. of Teamsters*, 2005 U.S. Dist. LEXIS 6835, *38-39 (E.D.N.Y. Mar. 22, 2005).

96.     As set forth in *Navika Capital Group, LLC v. Doe*, 2017 U.S. Dist. LEXIS 2926, at *50-54 (E.D.N.Y. Jan. 6, 2017):

> A party found to be liable for either tortious interference with contractual or prospective contractual relations is liable for: (1) pecuniary losses under the contract or the prospective business relationship; (2) consequential losses; and (3) emotional distress or actual harm to reputation. *Conte v. County of Nassau*, No. 06 CV 4746, 2015 U.S. Dist. LEXIS 43784, 2015 WL 1529787, at *5 (E.D.N.Y. Apr. 2, 2015) (*citing International Minerals and Res., S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996), *rev'd on other grounds*, 596 F. App'x 1 (2d Cir. 2014)). To establish consequential losses for tortious interference with prospective contractual relations, such as loss of future profits, a plaintiff must establish "both the existence and amount of such damages with reasonable certainty." *Id*. at *6 (citing *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000)). This does not require the plaintiff to prove lost profits "with absolute precision," but the lost profits must be "capable of measurement based upon known reliable factors without undue speculation." *Id*. (*quoting Sovereign Bus. Forms, Inc. v. Stenrite Indus., Inc.*, No. 00 CV 3867, 2000 U.S. Dist. LEXIS 17322, 2000 WL 1772599, at *13 (S.D.N.Y. Nov. 28, 2000)).

*Navika Capital Group*, 2017 U.S. Dist. LEXIS 2926, at *50-54. If the Court concludes that Bisnow's lost profits are not property as defined in the RICO statute, they are unquestionably recoverable on Plaintiff's tortious interference claim. (*Id*.).

97.     Plaintiff is entitled to punitive damages on its claim for tortious interference with business expectancy claim. "Punitive damages are available in tort actions 'where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime.'" *Raedle v. Credit Agricole Indosuez*, 2010 U.S. Dist. LEXIS 37066, at *3 (S.D.N.Y. Apr. 14, 2010) (quoting *Prozeralik v. Capital Cities Comm'ns, Inc*., 82 N.Y.2d 466, 479 (1993)). Also, "[c]ourts in the Second Circuit have held that punitive damages are available in actions for tortious interference with prospective employment where the defendant's conduct is

43

highly egregious and borders on the criminal." *Id.*, at *4 (citing *Carvel Corp. v. Noonan*, 350 F.3d 6, 24 (2d Cir. 2003); *Purgess v. Sharrock*, 33 F.3d 134, 142 (2d Cir. 1994)).

98.     For any damages for which the Court does not award treble damages under RICO, it should impose punitive damages in the amount of three times actual damages to punish Defendant's egregious misconduct.

99.     In addition, Plaintiff is entitled to 9% prejudgment interest on it tortious interference cause of action running from a date in the middle of Lopez-Pierre's tortious conduct. *See Goldhirsh Grp. v. Alpert*, 1995 U.S. Dist. LEXIS 2268, at *1-2 (S.D.N.Y. Feb. 24, 1995) (awarding 9% prejudgment interest on a claim for tortious interference with business relations).   In this case, because not all of Bisnow's damages occurred on the date Lopez-Pierre first interfered in Bisnow's business relationships, interest should run from a date in the middle of the course of Lopez-Pierre's tortious conduct. *See id.* (choosing November 1, 1994 as the date from which interest should run where the tortious conduct began on May 25, 1994).

## CONCLUSION

**WHEREFORE**, based upon the foregoing, and the accompanying submissions, and all prior proceedings heretofore had herein, including the ruling that Plaintiff is entitled to a default judgment as to liability, Plaintiff respectfully asks that this Court issue a Report and Recommendation:

A.     On Plaintiff's First Claim for Relief for violation of the RICO statute, compensatory damages of $800,768.56, then trebled for a total of $2,402,305.68, plus attorneys' fees and expenses in the amount of $112,071.91;

B.     On Plaintiff's Second Claim for Relief for Trade Libel, damages in the amount of $6,354,020.70, with punitive damages of three times that amount, or alternatively, depending on the Court's ruling on RICO damages, $7,154,789.26 with punitive damages of three times actual damages;

C.     On Plaintiff's Third Claim for Relief for Tortious Interference with Business Expectancy, damages in the amount of $6,354,020.70, or alternatively, depending on the Court's ruling on RICO damages, $7,154,789.26 with punitive damages of three times actual damages;

D.     The costs and disbursements for this action; and

      E.      Such other and further relief as this Court deems just and proper.

Dated:  New York, New York
       October 29, 2020

           Respectfully submitted,

           JUDD BURSTEIN, P.C.

           By:  /s/ Peter B. Schalk
               Peter B. Schalk (PBS-8257)
           5 Columbus Circle, Suite 1501
           New York, New York 10019
           (212) 974-2400
           (212) 974-2944 (Fax)
           pschalk@burlaw.com
           *Attorneys for Plaintiff*